## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1.   **CHRISTOPHER A. PERKINS,** | ) | |
| | ) | |
|       **Plaintiff,** | ) | |
| **v.** | ) | **CIV-14-** 794-F |
| | ) | |
| 1.   **FRONK OIL CO., INC., and** | ) | |
| 2.   **INSURANCE MANAGEMENT** | ) | |
|       **SERVICES,** | ) | |
| | ) | **ATTORNEY LIEN CLAIMED** |
|       **Defendants.** | ) | **JURY TRIAL DEMANDED** |

## COMPLAINT

**COMES NOW** the Plaintiff, Christopher A. Perkins, and for his Complaint in the above-entitled action, alleges and states as follows:

## PARTIES

1. Plaintiff, Christopher A. Perkins, is an adult male resident of Texas County, Oklahoma.

2. Defendants are:

      a. Fronk Oil Co., Inc. is an entity doing business in Texas County, Oklahoma, and

      b. Insurance Management Services, is an entity doing business in Texas County, Oklahoma.

## JURISDICTION AND VENUE

3. This is a cause of action arising out of Plaintiff's former employment with

Defendant Fronk Oil Co., Inc. based on claims of (a) age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), (b) disability discrimination and retaliation in violation of the ADA and ADAAA, (c) whistleblowing in violation of state law, (d) workers compensation retaliation, and (e) violations of Section 502(e)(1), et seq., of the Employment Retirement Income Security Act ("ERISA") (29 U.S.C. §1132 (e)(1), *inter alia*).

4.     This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §1331.  This Court has supplemental jurisdiction over Plaintiff's corresponding state law claim as it arises out of the same core of operative facts as the federal claims and jurisdiction over it is vested in this Court under 28 U.S.C. § 1367(a).

5.     All of the actions complained of herein occurred in Texas County, Oklahoma. Defendants are doing business in such county and may be served in said county.  Texas County is located in the Western District of Oklahoma.  Wherefore, venue is proper in this Court under 28 U.S.C. § 1391(b).

6.     Plaintiff has exhausted his administrative remedies by timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about February 14, 2014.  Plaintiff received his Dismissal and Notice of Rights letter from the EEOC dated April 30, 2014 (received by Plaintiff by mail thereafter) and has timely filed this action within ninety (90) days of receipt of the notice of right to sue.

## STATEMENT OF FACTS

7.     Plaintiff, Christopher A. Perkins, is an adult male who was born in January 1961, making him over the age of forty (40) at all times relevant to this action.

8.     Plaintiff began his career with Defendant Fronk Oil Co., Inc. ("Fronk") on or about April 1, 2012 when Defendant Fronk purchased Plaintiff's father's company, Perkins Petroleum, Inc.  Plaintiff had worked for Perkins Petroleum since in or around 1980 and most recently in the position of Automated Fuel Systems Manager/Vice President.  Plaintiff's new position with Defendant Fronk was a Fuel Systems Technician, Relief Delivery Driver and a Licensed Propane Manager.  These positions were essentially the same duties he had held with Perkins Petroleum.

9.     On or about April 19, 2012, Keith Fronk (Defendant Fronk's owner) wrote Plaintiff up, claiming "rudeness to customer/coworkers" allegedly for not reporting to Manager Joe Muse.  However, before Fronk purchased the company, Plaintiff and Muse were co-managers.  And, Plaintiff had not been told he was to report to Muse.

10.     In or around May 2010, Plaintiff suffered a minor stroke (TIA).

11.     In or around May 2013, Plaintiff sought medical treatment for neck pain and numbness in his arm and hand.  At that time, Plaintiff was diagnosed with cervical degenerative disk disease.  He provided Muse with a letter from his doctor on or about June 3, 2013, identifying Plaintiff's diagnosis and his need for a reasonable accommodation in the form of a pneumatic seat installed in his truck to accommodate Plaintiff's medical condition.

Muse took the paperwork from Plaintiff, but made no comment.

12.     In or around the first week of June 2013, Plaintiff underwent a surgical procedure on his right hand for a biopsy of a growth on his right thumb.  Plaintiff was off of work for approximately one (1) day, returning to work on or about June 5, 2013.  He provided a copy of his doctor's note to Muse, releasing him to return to work with limited restrictions in that he was not to use his right hand for one week. Muse took the paperwork from Plaintiff, but again gave no comment.

13.     Due to his medical conditions, Plaintiff is a qualified individual with a disability in that he is disabled, has a record of a disability and/or was perceived as disabled. His disabilities substantially limit and/or limited him in one or more major life activities, including but not limited to walking, sitting, grabbing, lifting, pushing, pulling, concentrating, and standing.  His disabilities impact one or more of his internal bodily processes, including but not limited to his musculoskeletal system and brain function. However, at all times relevant hereto, he was able to perform the essential functions of his job with or without reasonable accommodations.

14.     The day after his return to work, on or about June 6, 2013, Muse directed Plaintiff to go on a delivery using a truck without a fully-functioning pneumatic seat, despite the fact that Defendant Fronk had a truck that would comply with Plaintiff's medical restrictions.  When Plaintiff reminded Muse of his doctor's note, Muse became frustrated and told Plaintiff to go home if he could not make the delivery as directed, whereupon Plaintiff

suggested he do maintenance work that complied with his medical restrictions.   Muse begrudgingly agreed.

15.   The following day, on or about June 7, 2013, Plaintiff provided Muse with a formal request for accommodation regarding the pneumatic seat.  Defendant Fronk's older truck seats failed to reduce impact on his cervical disks and vertebra, causing severe neck pain and numbness in his right arm and hand.   However, Defendant Fronk had a truck available that complied with his medical restrictions and his requested reasonable accommodation, but gave it to another driver to use.  In response to Plaintiff's request, Muse stated that Plaintiff was just causing problems for himself.

16.   In or around mid-June 2013, Fronk asked Plaintiff to go to a client's ranch and determine what would be required to provide liquid propane to an old generator installed in a wooden barn.  Plaintiff inspected the unit, then notified Fronk that installing the system would be against national safety codes, declined to install the system, and gave alternative suggestions. Plaintiff was told to forget about it and not asked to work on the unit again.

17.   On or about August 27, 2013, Plaintiff was again directed by Muse to drive a delivery truck that did not comply with his medical restrictions.  Plaintiff reminded Muse of his restrictions and requested accommodation.   Muse, who was clearly annoyed with Plaintiff's request, responded that he would have Manager Greg Coulson do the delivery.

18.   The following day, on or about August 28, 2013, Fronk presented Plaintiff with a write-up because Plaintiff allegedly "refuse[d] to help make deliveries and a manager ha[d]

5

to go do it" and accused Plaintiff of performing tasks too slowly.  Plaintiff submitted a written response to the write-up, stating that among his other concerns, the write-up was discriminatory and in retaliation for Plaintiff's requests for a reasonable accommodation.

19.     On or about September 5, 2013, Plaintiff injured his left ankle while on a job delivery.  Plaintiff believed the injury to be a sprain that would heal on its own, but notified Coulson of his injury on or about September 6, 2013.  Coulson did not express any concern for Plaintiff's well-being and did not complete or request that Plaintiff complete an accident report.

20.     On or about October 14, 2013, Coulson asked Plaintiff if he had made a visit to one of their clients to address a problem they had been having.  Plaintiff truthfully answered that he had forgotten to do so.  Plaintiff then arranged a meeting with Coulson and Muse, where Plaintiff explained that he had occasional lapses in memory since his minor stroke in or around May 2012, and in an effort to prevent the problem from happening again, he would write himself a note whenever he was to perform a specific task.  Coulson and Muse agreed with Plaintiff's proposal.

21.     However, approximately thirty (30) minutes after the meeting, Coulson gave Plaintiff a write-up, despite other employees not being disciplined for similar offenses.

22.     On or about the morning of October 23, 2013, Plaintiff notified Coulson of severe pain he was experiencing in his ankle resulting from his previous on the job injury on or about September 5, 2013.  Coulson stated that there was nothing he could do for Plaintiff,

as Plaintiff had not completed an accident report at the time of his injury.  Plaintiff reminded Coulson that he had informed him of his injury shortly after it occurred.  Coulson then instructed Plaintiff to contact Monty Reeves, Defendant Fronk's in-house legal counsel, at Defendant Fronk's main office in Booker, Texas.  When Plaintiff did, Reeves directed Plaintiff to complete an accident report and then see a doctor.

23.     Plaintiff completed the paperwork as directed before going to an urgent care clinic.  The clinic sent Plaintiff to a hospital for x-rays, prescribed him anti-inflammatory medication, and put his foot in a walking boot.  Plaintiff was diagnosed with a third degree sprained ankle and put on light duty, in that he was to minimize the use of his left ankle.  Plaintiff immediately notified Coulson of his diagnosis and restrictions.  Coulson told Plaintiff to bring him the doctor's note the following day, but that he could not return to work until he was released for full duty.

24.     The following day, October 24, 2013, Plaintiff took his doctor's note to the office to give to Coulson as directed.  Upon his arrival, Plaintiff noticed that his office had been rearranged and that some of his personal items had been removed.

25.     On or about October 29, 2013, Plaintiff discovered that he had not been invited to a retirement party for Muse that was held at Defendant Fronk's office on October 25, 2013. And, Coulson was promoted to Muse's former position.

26.     Also, on or about October 29, 2013, Plaintiff filed a Form 3 with the Oklahoma Workman's Compensation Court for his on-the-job ankle injury.

27.    Additionally, on or about October 29, 2013, Plaintiff received a certified letter from Defendant Fronk dated October 22, 2013 and signed by Fronk.  The letter stated that "Fronk Oil Company does not consider you to be a person with a disability, nor have you made the Company aware that you have a physical or mental impairment," despite Plaintiff's formal written request for reasonable accommodation and supplying Defendant Fronk with doctor's notes.  Additionally, the letter requested Plaintiff provide his doctor's "written opinion" on his impairments, despite Plaintiff already having provided Defendant Fronk with his doctor's notes.

28.    On or about October 31, 2013, Plaintiff went to Defendant Fronk's office to retrieve a document from his computer.  However, when Plaintiff tried to log into his computer, he discovered that his user account and all of his data had been deleted.  Plaintiff asked Coulson what happened and was told that due to some problems, Matt (last name unknown), the IT Director, had to delete Plaintiff's account on or about October 25, 2013, just two days after Plaintiff filled out his accident report form.  Coulson also stated that from then on, employees would have to have Coulson enter a password before signing onto the computer and that two days of data had been lost.  Plaintiff offered to try to retrieve the data, as he had been able to do so previously, but received no response.

29.    The same day, Plaintiff noticed that the facility keyed padlocks had all been replaced with combination padlocks.

30.    That afternoon, Plaintiff called Reeves to ask how many individuals Defendant

Fronk employed, as he needed the information to complete a form for the EEOC.  Reeves asked if Plaintiff was going to file a Charge with the EEOC against Defendant Fronk, to which Plaintiff responded "Yes, sir."  Reeves then told Plaintiff that the EEOC already has Defendant Fronk's information from a charge filed the previous year.

31.     On or about November 1, 2013, Plaintiff called Defendant Fronk's worker's compensation carrier to check on the status of his worker's compensation case.  He was informed the carrier had not received a report of Plaintiff's injury.  Plaintiff then contacted the Worker's Compensation Court to confirm he contacted the correct carrier, which he had.

32.     On or about November 13, 2013, Plaintiff provided the doctor's letter and medical documents to Coulson as requested in the letter dated October 22, 2013.  While at the office, Plaintiff noticed his desk had been removed from the office, leaving only the desk used by Coulson.

33.     On or about November 20, 2013, Plaintiff received a full release to return to work related to his ankle injury and notified Coulson that he could return to work the following day.  That evening, Plaintiff received a text message from Fronk, directing that Plaintiff remain at home until notified by Fronk.

34.     On or about November 29, 2013, Fronk notified Plaintiff that he could return to work on December 2, 2013 at 8:00 a.m.  Plaintiff asked why, as he had always worked from 7 a.m. to 5 p.m.  Fronk stated that Plaintiff's new hours were to be 8 a.m. to 5 p.m,, despite other employees still arriving to work at 7:00 a.m.

35.     On or about December 4, 2013, Plaintiff was on a job with another employee for the morning, returning to the office around 2:30 p.m.  Since Coulson was out of the office, Plaintiff spoke with the Dispatcher Rhonda Critser about going to inspect equipment that another client had reported was not working.  Plaintiff inspected the equipment, discovered the problem, and called Critser to inform her of the issue and get approval for his suggested remedy.  Critser approved the repair, and Plaintiff returned to the office around 3:30 p.m.

36.     Plaintiff was scheduled to deliver propane to a new customer's house at 4:00 p.m., but realized he would not make it on time.  Plaintiff called the customer in the presence of Critser and notified them that he was running late.  Plaintiff then performed the legally required inspections on the propane truck before he was able to leave on the delivery, delivered the propane, completed the pressure tests, made necessary repairs, and completed the required paperwork before returning to the office shortly after 6:00 p.m.

37.     The following morning, on or about December 5, 2013, Plaintiff was called by Coulson into the office of Robbie Blackwelder, Chief Bookkeeper.  Plaintiff was then berated for having taken a fifteen (15) minute break the previous day to eat lunch (while he was waiting for his tests to finish) and for returning to the office after 6:00 p.m. the previous day.  Plaintiff explained the circumstances, but Coulson was not receptive.  Twice during the conversation, Coulson called Plaintiff "old."

38.     One week later, on or about December 12, 2013, Plaintiff was terminated by

Fronk and Director of Operations, Tom Adornetto.  Plaintiff was told the reason for his

termination was that he was late to an appointment the previous week.  Plaintiff explained

that he had Critser's approval for the late delivery.  Fronk then tried to modify the reason for

termination by stating, "well, we've got those warnings which are enough."

39.     Thereafter, Plaintiff filed for unemployment benefits with the OESC.  He was

notified by the OESC about a month after his termination that Defendant Fronk was claiming

a different reason for termination: that Plaintiff had allegedly failed to properly address a leak

in a customer's propane system.   However, the leak was discovered after Plaintiff's

termination (meaning that could not be the reason for termination as it was not known at that

time), and Plaintiff had tested the tank per industry standards and explained to the customer

that temperature dependant leaks were possible, and should they smell gas to immediately

call Plaintiff.

40.     Upon information and belief, Plaintiff was replaced by significantly younger

individual.

41.     Plaintiff was a covered participant under a group health plan ("Plan") provided

to Plaintiff through his employment with Defendant Fronk.  Defendant Fronk deducted a

portion of Plaintiff's income from his paycheck in order to finance, either in whole or in part,

Plaintiff's participation in the Plan.

42      Under the terms of the Plan, Defendant Fronk contracted with Defendant

Insurance Management Services to provide medical benefits to Plaintiff.

43.     Following the term of Plaintiff's employment with Defendant Fronk, neither of the Defendants, the employer or the group health plan administrator, provided Plaintiff with the required notice of his rights under the Consolidated Omnibus Reconciliation Act of 1985 ("COBRA"), 29 U.S.C. §1166. Moreover, Defendants never provided Plaintiff with the COBRA election materials.

44.     COBRA provides employees with the right to continuing health coverage through their employer following a qualifying event, such as termination. It is the employer's obligation to notify the plan administrator when an employee's employment is terminated. The plan administrator must give written notification to the employee explaining their right to continuing coverage within 14 days and supply them with the means to accept this coverage.

45.     Plaintiff's termination was a qualifying event under Section 603 of the Act.

46.     Employers are required to maintain records "sufficient to determine the benefits due or which may be due [its] employees." 29 U.S.C. §1059.  It also imposes this record keeping requirement on plan administrators, therefore requiring both the employer and plan administrator to maintain records showing when COBRA notice is to be given to a terminated employee.  The burden of proof is on the employer to affirmatively prove that COBRA notice was received by the employee. And, an employer has a good faith duty to adhere to these requirements.

47.     As a direct and proximate result of Defendants' actions, Plaintiff has suffered

the injuries described hereafter.

## COUNT I - ADEA

For his first cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows.

48.     This count goes against Defendant Fronk.

49.     The matters alleged above constitute violations of the ADEA in the form of age discrimination.

50.     Plaintiff is entitled to relief under the ADEA because, at all times relevant to this action, he was over the age of forty (40), was qualified for his job, was terminated, and his position was not eliminated at the time of his termination.

51.     As damages, Plaintiff has suffered lost earnings, past and future, and other equitable and compensatory damages allowed by the Civil Rights Act of 1991.  Plaintiff is also entitled to liquidated damages based upon Defendant's willful conduct.

## COUNT II - ADA AND ADAAA

For his second cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

52.     This count goes against Defendant Fronk.

53.     The matters alleged above constitute discrimination and retaliation based on a disability, a record of a disability and/or perceived disabilities in violation of the ADA and ADAAA.

54.     More specifically, Plaintiff was a qualified individual with a disability in that he suffers from impairments (i.e., degenerative disk disease, ankle and hand injury, memory loss) which substantially limit his ability to perform one or more major life activities as set forth above.  Further, Plaintiff's disabilities impact one or more of his internal bodily processes as shown herein.

55.     Despite said impairments, Plaintiff could perform the essential functions of his job with or without reasonable accommodations at all relevant times hereto.

56.     As a direct and proximate result of Defendant's actions, Plaintiff has suffered lost income, past and future, emotional distress and other non-pecuniary losses.

57.     Because the actions of Defendant were willful, wanton or, at the least, in reckless disregard of Plaintiff's rights, Plaintiff is entitled to punitive damages.

## COUNT III - Whistleblowing

For his third cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

58.     This count goes against Defendant Fronk.

59.     The acts above-described also constitute a violation of Oklahoma's public policy which prohibits wrongful termination and retaliation against a whistle-blower for performing an act consistent with a clear and compelling public policy, i.e., refusing to participate in an illegal activity; performing an important public obligation; exercising a legal right or interest; exposing some wrongdoing by the employer; and performing an act that

14

public policy would encourage or, for refusing to do something that public policy would condemn.

60.    As damages, Plaintiff has suffered lost earnings, past and future, and other compensatory damages.

61.    Because the actions of the Defendant were willful, wanton or, at the least, in reckless disregard of Plaintiff's rights, Plaintiff is entitled to punitive damages.

## COUNT IV:  WORKERS' COMPENSATION RETALIATION

For his fourth cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

62.    This count goes against Defendant Fronk.

63.    Defendant's actions, as described above, constitute retaliation in violation of the Oklahoma Workers' Compensation Act, 85 O.S. §341.

64.    Plaintiff sustained a job-related injury for which he could assert a claim for benefits under the Oklahoma Workers' Compensation Act.

65.    Defendant had knowledge of Plaintiff's work-related injury.  Defendant terminated Plaintiff's employment shortly after he put them on notice of his injury.

66.    As a direct and proximate result of Defendant's actions, Plaintiff has suffered lost income, past and future, emotional distress and other non-pecuniary losses.

67.    Defendant's actions were willful, wanton and/or conducted in a reckless disregard of Plaintiff's rights, thereby entitling Plaintiff to punitive damages.

## COUNT V - ERISA/COBRA

For his fifth cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

68.     This count goes against both Defendants.

69.     The matters alleged above constitute violations ERISA for Defendant's failure to provide Plaintiff with a notification of COBRA coverage after a qualifying event, i.e., his termination.

70.     COBRA provides employees with the right to continuing health insurance coverage through their employer following their termination from employment.

71.     In order to inform the terminated employee of their rights to continuation coverage, a plan administrator is obligated to provide notice to the terminated employee of their right to continuation coverage under COBRA.  ERISA §606(a), 29 U.S.C. c1166(a). It is the employer's obligation to notify the plan administrator when an employee terminates their employment with the employer. *Id*.

72.     Plaintiff has never received any communication from Defendant of his rights under COBRA.

73.     Defendant failed to provide notice as is required pursuant to COBRA, thereby violating all legal duties owed to Plaintiff.

74.     Under ERISA §502, a participant may bring a civil action in federal court for an ERISA violation in order to recover benefits due to him under a benefit plan.  ERISA

16

§502(a)(1)(b), 29 U.S.C. (a)(1)(b).

75.     As a direct and proximate result of Defendant's actions, Plaintiff has suffered additional cost to maintain healthcare for himself, emotional distress and other non-pecuniary losses. As such, Plaintiff seeks all damages available under federal law, including but not limited to his medical expenses, $110 per day from the date of the failure to provide timely notice to Plaintiff, coverage of his medical insurance, attorney's fees and costs.

### REQUEST FOR RELIEF

**WHEREFORE,** Plaintiff prays that this Court enter judgment in favor of the Plaintiff and against the Defendant and assess actual, compensatory, punitive damages, and liquidated damages, together with pre- and post-judgment interest, costs, attorney's fees and such other relief as this Court may deem equitable and appropriate.

**RESPECTFULLY SUBMITTED THIS 25th DAY OF JULY, 2014.**

s/Jana B. Leonard
JANA B. LEONARD, OBA# 17844
EMILY VAN VOLKINBURG, OBA #31744
LEONARD & ASSOCIATES, P.L.L.C.
8265 S. WALKER
OKLAHOMA CITY, OK 73139
(405) 239-3800      (telephone)
(405) 239-3801      (facsimile)
leonardjb@leonardlaw.net
emilyv@leonardlaw.net

JURY TRIAL DEMANDED
ATTORNEY LIEN CLAIMED